THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DONALD SPICER, Defendant-Appellant.

First District (2nd Division)   No. 86—0636

Opinion filed October 27, 1987.—Rehearing denied November 24, 1987.

82

Steven Clark and Joan S. Colen, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Thomas V. Gainer, Jr., Robert Podlasek, and Sharon K. Bachert-Bedford, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BILANDIC delivered the opinion of the court:

Following a bench trial, defendant, Donald Spicer, was convicted of murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)), armed violence (Ill. Rev. Stat. 1985, ch. 38, par. 33A—2), and attempted armed robbery (Ill. Rev. Stat. 1985, ch. 38, pars. 8—4, 18—2). Defendant was sentenced to concurrent terms of 40 years for three counts of murder and 15 years for attempted armed robbery.[1] On appeal, defendant contends: (1) eyewitness lineup identification evidence should have been suppressed as the fruit of an illegal arrest; (2) the State failed to prove him guilty beyond a reasonable doubt; (3) the trial court erred in failing to appoint substitute counsel and in failing to conduct a hearing on defendant's *pro se* motion for new trial alleging ineffective assistance of trial counsel; and (4) the trial court erred when it entered judgment and imposed sentence on three counts of murder where only one death occurred. For the following reasons we affirm in part and vacate in part.

The evidence shows that William Davis was shot and killed during the commission of an attempted armed robbery. On October 28, 1983, at approximately 4 p.m., two black men were "buzzed" into the premises of Venus Lingerie by the owner, William Davis. Employees Ruth Sanders, Mr. Davis' sister, and Pearl Jordan were there when the men entered.

Both men pulled guns as soon as they entered the premises. The

---

[1]The armed violence count merged with the murder counts at final disposition.

men told Ms. Sanders and Ms. Jordan to place their purses on their desks and then asked what was in the back room. The women later told the police that one man was short and stocky and the other was tall and slender. Defendant was identified as the short man.

The tall man directed the women into the back room and ordered them to lie face down on the floor. When he noticed that Ms. Jordan was on her side, he kicked her. Both women were then tied with telephone cords.

The short man was with Mr. Davis in the entrance area and then followed him into the back office where the women were. As Davis came into the room, he saw the women tied up and said, "I don't believe you guys got bullets in those guns." Defendant responded that they did and then shot Davis.

Mr. Davis picked up an office chair and backed the two men out of the office area, out of the women's view. The women heard a struggle in the hallway, then a shot and then silence.

Shortly thereafter, Davis called to the women and told them that the men had left. The women freed themselves and went to Davis' aid. They found Davis sitting in the hallway bleeding and immediately phoned the police. Mr. Davis died while at the hospital.

Both women went to the police station that evening and described the assailants. One was a dark-skinned black man, short, stocky, and approximately 35 to 40 years old. The other was a black man with a medium complexion, tall, slender, and approximately 35 to 40 years old. Both men wore dark clothing but neither wore a mask. The office was well lighted and both women got a good look at the men. They told the police that they could identify the assailants but did not see either of the assailants in any photographs given to them that evening.

On November 4, 1983, seven days after the murder, detectives took a group of six photographs to Ms. Sander's home. There is conflicting testimony as to when the police took the photographs to Ms. Jordan's home for her viewing, but it was about the same time. Both women immediately identified the defendant from the photographs.

The evidence shows that the police selected this particular group of photographs, including the defendant's, because they knew that these six men associated with each other. There was also testimony that these six men, including defendant, had been acquitted in an unrelated case.

The police issued a "stop order" on defendant as a result of the eyewitness identification. The "stop order," issued November 4, 1983, directed law enforcement officials to notify detectives if the defendant

was picked up for any violation. Detective DiGiacomo testified that one of the witnesses gave him the defendant's address at this time. The record is unclear as to how the witness knew defendant's address.

Sometime between 9 and 10 p.m. on November 15, 1983, 11 days after detectives knew defendant's address, Detectives DiGiacomo and Solecki went to defendant's apartment without a warrant. There is no evidence that the officers received any new information during these 11 days.

Defendant answered his door and allowed the detectives to enter. Four guests, two females and two males, were at defendant's apartment at this time. The defendant and the two detectives stepped into a room to talk. The detectives told the defendant that he had been identified from photographs shown to witnesses involved in a robbery and requested that he accompany them to appear in a lineup.

The defendant became "loud and abusive" and told the detectives that there was no way he was going anywhere with the officers. At this time, defendant backed the officers out of the apartment and locked the door behind them.

Detective Solecki went to call for assistance while Detective DiGiacomo remained in the hallway to guard the door. Defendant peeked out the door of his apartment a few minutes later to see if the officers were still there and promptly locked the door again.

About 10 or 15 minutes later, six to eight more officers arrived. Some of them remained on the street to watch the windows of defendant's apartment. The others knocked on defendant's door, announced who they were, and told the defendant that if he did not open the door they would break it down.

When defendant did not open the door, the officers went to a nearby fire station, got a pry bar and a sledgehammer and forced the door open.

Everyone in the apartment was arrested and taken to the station. The testimony indicates that no weapons were seen or recovered from the apartment and no attempts to flee or escape were made.

Ms. Sanders and Ms. Jordan independently positively identified defendant from a lineup conducted the following day at the station.

While in custody, defendant told an assistant State's Attorney that on the day of the murder he was doing chores with Claude Jones from about 8 a.m. until 1 p.m. He took a nap in the afternoon and woke up at about 7 p.m. He said that his girlfriend, Etta Jones, could verify this. Ms. Jones was contacted but could not recall the events of the day of the murder. She was seriously ill and died shortly thereafter.

Claude Jones told the police that he remembered being with the defendant but could not recall the specific date. The day after he told this to the officers, Mr. Jones phoned the station to inform them that he remembered being with the defendant the day of the murder. They did errands and went to lunch on that day.

At the bench trial, defendant gave a detailed account of his whereabouts on the day of the murder. He testified that he was with Claude Jones and Kevin Cooks all day. Defendant testified that he had injured his index finger a couple of days before the murder took place and his finger was in a bandage and a splint. The bandage and splint were removed on October 29, 1983, the day after the murder. Kevin Cooks' testimony corroborated defendant's alibi.

Both eyewitnesses identified the defendant in court during the trial. No physical evidence was introduced by the State. The court found defendant guilty of three counts of murder, armed violence and attempted armed robbery.

Defendant filed a *pro se* motion to quash and dismiss the information at the hearing on post-trial motions and sentencing. The court denied defendant's *pro se* motion and defense counsel's post-trial motions. Following evidence in aggravation and mitigation, defendant made a statement on his own behalf. He alleged ineffective assistance of trial counsel premised on counsel's failure to elicit testimony about the bandage on defendant's finger at the time of the murder and her alleged failure to call witnesses crucial to his defense. Defendant's motions for new counsel and a new trial were denied without further hearing.

The court sentenced defendant to concurrent terms of 40 years on all three counts of murder and 15 years for attempted armed robbery. This appeal followed.

## I

### A

First, defendant argues that his arrest was illegal because the police forcibly entered his home without a warrant, without consent and without exigent circumstances 11 days after they had probable cause to arrest him in violation of *Payton v. New York* (1980), 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371. Defendant asserts that evidence of the lineup should have been suppressed as fruit of the illegal arrest. The State contends that exigent circumstances existed which necessitated defendant's arrest. Therefore, the arrest was valid and evidence of the subsequent lineup identification was properly admitted.

It is undisputed that the police did not have a warrant and the defendant has conceded that probable cause to arrest existed. Therefore, the first issue is whether defendant's arrest was illegal.

*Payton* is directly on point and is dispositive of this issue. The fourth amendment to the United States Constitution prohibits the police from making a warrantless and nonconsensual entry into a suspect's home in order to make a routine felony arrest. (445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.) In *Payton*, the police had sufficient evidence to establish probable cause within two days of a murder. On the third day after the murder, six officers went to Payton's apartment intending to arrest him. They did not obtain a warrant. Although the police heard music emanating from defendant's apartment, there was no response to their knock at the door. The police summoned emergency assistance and about 30 minutes later used crowbars to break open the door and enter the apartment. No one was present, but a .30 caliber shell casing was in plain view. The shell casing was seized and admitted into evidence at defendant's trial. The Supreme Court found this seizure to be illegal and ordered the suppression of the evidence as fruit of the illegal seizure. 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371.

■ Physical entry of the home is the chief evil against which the wording of the fourth amendment is directed. To be arrested in one's home involves not only the invasion attendant to all arrests, but also an invasion of the sanctity of the home. Accordingly, it is too substantial an invasion to allow without a warrant, in the absence of exigent circumstances, even when probable cause is present. The fourth amendment has drawn a firm line at the entrance to one's home. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant. 445 U.S. 573, 590, 63 L. Ed. 2d 639, 653, 100 S. Ct. 1371, 1382.

The officer's entry in the present case was not pursuant to a warrant. While the first entry was consensual, the forcible entry was clearly nonconsensual. Therefore, in order to justify the officers' entry into defendant's home, there must be showing of exigency.

## B

■ We now address the question of whether exigent circumstances were present to justify defendant's warrantless arrest. We conclude that no such exigency existed.

The trial court determined that exigent circumstances justified the warrantless forcible entry and arrest, citing the seriousness of the

offense and the risk that either the defendant or one of his guests was armed.

■ The question of whether exigent circumstances exist is a question of law, subject to *de novo* review by this court. *People v. Abney* (1980), 81 Ill. 2d 159, 168, 407 N.E.2d 543.

Our supreme court has established general guidelines for the determination of whether exigent circumstances existed at the time of arrest. The circumstances must " 'militate[] against delay and justif[y] the officers' decision to proceed without a warrant.' " (*People v. White* (1987), 117 Ill. 2d 194, 216, quoting *People v. Abney* (1980), 81 Ill. 2d 159, 168-69, 407 N.E.2d 543.) In addition, the police officers must act in a "reasonable fashion." *People v. Abney* (1980), 81 Ill. 2d 159, 169, 407 N.E.2d 543.

No clear-cut test exists to determine the presence of exigent circumstances. Rather, the guiding principle is the reasonableness of the actions taken by the police. Each case must be determined on the basis of the facts known to the arresting officers at the time they acted, without the aid of hindsight. *People v. Yates* (1983), 98 Ill. 2d 502, 515, 456 N.E.2d 1369, *cert. denied sub nom. Williams v. Illinois* (1984), 466 U.S. 981, 80 L. 3d 2d 836, 104 S. Ct. 2364.

■ While no list of factors relating to the determination of whether exigent circumstances exist can be considered exhaustive, the following factors should be taken into account: (1) whether the offense has been recently committed (*People v. Abney* (1980), 81 Ill. 2d 159, 169, 407 N.E.2d 543); (2) whether there was any deliberate or unjustified delay by the officers during which time a warrant could have been obtained (81 Ill. 2d 159, 170, 407 N.E.2d 543); (3) whether a grave offense is involved, particularly a crime of violence (*People v. Yates* (1983), 98 Ill. 2d 502, 515, 456 N.E.2d 1369); (4) whether the suspect is reasonably believed to be armed (98 Ill. 2d 502, 515, 456 N.E.2d 1369); (5) whether the police officers were acting upon a clear showing of probable cause (98 Ill. 2d 502, 515, 456 N.E.2d 1369, accord *People v. Abney* (1980), 81 Ill. 2d 159, 171-72, 407 N.E.2d 543); (6) whether there is a likelihood that the suspect will escape if not swiftly apprehended (*People v. Yates* (1983), 98 Ill. 2d 502, 515, 456 N.E.2d 1369); (7) whether there is a strong reason to believe that the suspect is in the premises (98 Ill. 2d 502, 515, 456 N.E.2d 1369); and (8) whether the police entry, though nonconsensual, is made peaceably (98 Ill. 2d 502, 515, 456 N.E.2d 1369). (See 98 Ill. 2d 502, 516, 456 N.E.2d 1369 (citing various cases and recognizing that exigent circumstances may exist where there is only a serious crime coupled with a reasonable possibility of imminent danger to life, serious dam-

age to property, destruction of evidence, or the likelihood of flight).) These factors must only be satisfied on balance and may not all be present in every case. *People v. Cobb* (1983), 97 Ill. 2d 465, 484, 455 N.E.2d 31.

In the present case, an assessment of the above enumerated factors clearly demonstrates that no exigency existed. The defendant admits that the officers had probable cause to arrest and knew defendant's address for 11 days prior to the arrest. There was no evidence that the officers received any new information or evidence during the time between the photographic identification by the two eyewitnesses, knowledge of defendant's address and defendant's arrest. Furthermore, the officers admitted that they could have obtained an arrest warrant but did not do so. The issuance of the "stop order" by the officers is highly probative of the existence of probable cause. Thus, an unjustified unnecessary delay of at least nine days, during which time a warrant might have been obtained, preceded the defendant's warrantless arrest. Such an inordinate delay during which time a warrant could have been obtained undercuts any claims of justification for forcibly entering defendant's home and arresting him without a warrant. Moreover, this delay clearly belies the State's argument that an exigency existed. See *People v. Lekas* (1987), 155 Ill. App. 3d 391, 508 N.E.2d 221.

No weapons or contraband were observed in defendant's apartment and defendant was unarmed. The offense occurred on October 28, and the arrest on November 15. Thus, it cannot be argued that the arrest was within the spirit of the hot pursuit doctrine. Since the officers broke the door down with a pry bar and sledgehammer, the entry was clearly not peaceable.

Further considerations in favor of a finding of exigency are those related to the gravity of the offense, the possibility that the defendant was armed, and the possibility that the defendant might attempt to flee. *People v. White* (1987), 117 Ill. 2d 194, 216-17.

In the case at bar, there was no evidence that the officers feared defendant would escape until the officers alerted defendant by their first consensual entry followed by their retreat. Moreover, the officers testified that the only exit from defendant's apartment was watched constantly by officers between the time of the consensual entry and the forcible entry. The State further contends that promptness of action was necessitated by the officers in order to prevent injury to the officers and the guests inside defendant's apartment. However, whatever fear the officers arguably had for either their own safety or the safety of defendant's guests came after the officer's initial consen-

sual entry. The fact that the officers retreated clearly undercuts this argument. Thus, we conclude that a classic example of police-created exigency existed in this case which cannot be a basis for the warrantless forcible entry and arrest of the defendant. *People v. Klimek* (1981), 101 Ill. App. 3d 1, 5, 427 N.E.2d 598.

Law enforcement officials know that the making of an illegal arrest will sometimes make possible a station house identification, which will in turn provide the basis for an in-court identification. (4 W. LaFave, Search and Seizure sec. 11.4, at 439 (2d ed. 1987).) In the case at bar, the deliberate acts of the officers contravene the State's claim of exigency. To approve the consequences of such an unjustified, forcible entry into the home of the defendant to make an arrest, where any exigency was police-created, would "render fourth amendment protections vulnerable to possibly even more imaginative government-created exigencies and quickly render the warrant requirement a nullity." (*People v. Wilson* (1980), 86 Ill. App. 3d 637, 643, 408 N.E.2d 988.) Defendant's arrest was clearly violative of his fourth amendment rights.

## C

■ Based upon our determination that the arrest was illegal and violative of defendant's fourth amendment rights, it follows that the evidence of the lineup identification should have been suppressed as fruit of the illegality. (*Brown v. Illinois* (1975), 422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254.) The lineup was conducted the day after the illegal arrest. There is no evidence of any intervening actions which would purge the taint of the illegal arrest. (422 U.S. 590, 602, 45 L. Ed. 2d 416, 426, 95 S. Ct. 2254, 2261.) Thus, the evidence of the lineup identification should have been suppressed.

## D

Since we have determined that the pretrial station house lineup identification was the fruit of the prior illegal arrest rendering evidence of that identification inadmissible at trial, the next question becomes whether it follows from that determination that an in-court identification made by the same witnesses present at the lineup must also be suppressed. Defendant urges that remand for a hearing on this issue is required in order to determine whether the in-court identification was tainted by the lineup identification. We think not.

■ *United States v. Crews* (1980), 445 U.S. 463, 63 L. Ed. 2d 537, 100 S. Ct. 1244, is dispositive of this issue. In *Crews*, the in-court identification of the defendant by a robbery victim was held not to be

a fruit of defendant's earlier illegal arrest. In the case at bar, as in *Crews*, Ms. Sanders' and Ms. Jordan's presence in the courtroom was not the product of any police misconduct. Both eyewitnesses were present at trial to testify as to what occurred during the offense and to identify the defendant as one of the culprits. The in-court identification came from the witnesses' ability to reconstruct the crime and to identify the defendant from their observations of him at the time of the crime and their presence in the courtroom. (445 U.S. 463, 471-72, 63 L. Ed. 2d 537, 545-46, 100 S. Ct. 1244, 1249-50.) In other words, the in-court identification of the defendant was based upon the eyewitnesses' firm recollection of defendant at the crime scene. Additionally, both eyewitnesses identified the defendant from a group of photographs presented to them prior to the illegal arrest. The defendant's identity was known long before there was any official misconduct. Indeed, the knowledge of the defendant's identity well before the arrest is the linchpin of our finding that the arrest was illegal. Thus, the evidence of the photographic identifications made by the eyewitnesses as well as the in-court identifications is not traceable to the fourth amendment violation and need not be suppressed.

■ We further find, however, that the erroneous admission of the lineup evidence was harmless error. Our review of the record in this case demonstrates that there was sufficient competent admissible evidence of identification of the defendant by the two eyewitnesses to show beyond all reasonable doubt that the defendant is guilty. Thus, the evidentiary error was harmless and clearly was not prejudicial. (*People v. Carlson* (1982), 92 Ill. 2d 440, 449, 442 N.E.2d 504.) Accordingly, neither a reversal of the convictions nor a remand is necessary.

## II

Defendant next asserts that the State failed to prove him guilty beyond a reasonable doubt because: (1) the identification testimony was weak; (2) there was a possibility of improper police influence behind the identifications; (3) the State failed to introduce physical evidence to corroborate testimony; and (4) defendant's alibi was consistent and credible. These arguments are not persuasive.

First, both eyewitnesses testified that they had an adequate opportunity to observe the defendant. The area was well lighted, and neither assailant wore a mask. Ms. Sanders and Ms. Jordan each identified the defendant from a group of photographs shown to them within a week after the offense.

Defendant's alibi testimony at trial was inconsistent with the first

statements given after his arrest. At trial, defendant's mother testified that she was present at defendant's preliminary hearing and that prior to that hearing one of the arresting officers told the eyewitnesses to point the finger at defendant because he had recently beaten charges in an unrelated case. Defendant maintains that this "possibility" of some improper influence weakened the identification testimony.

The State called Ms. Sanders' brother, whose testimony rebutted this accusation. Moreover, this argument completely ignores the identifications made by the witnesses prior to trial.

■■ It is the trier of fact's function to assess the credibility of witnesses and to determine the weight and the inferences to be drawn from the evidence. (*People v. Bradford* (1985), 106 Ill. 2d 492, 478 N.E.2d 1341.) A reviewing court will not set a conviction aside unless the evidence is so unsatisfactory that it raises a reasonable doubt of defendant's guilt. (*People v. Adams* (1985), 109 Ill. 2d 102, 115, 485 N.E.2d 339, *cert. denied* (1986), 475 U.S. 1088, 89 L. Ed. 2d 730, 106 S. Ct. 1476.) Viewing the evidence in the light most favorable to the prosecution, we cannot say that no rational trier of fact could have found defendant guilty beyond a reasonable doubt. *People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.

■■ Where identification of the accused is at issue, as here, the testimony of a single witness is sufficient to support a conviction even in the presence of contradictory alibi testimony, provided that the witness is credible and viewed the defendant under circumstances which would permit a positive identification. (*People v. Yates* (1983), 98 Ill. 2d 502, 525, 456 N.E.2d 1369.) Therefore, the State met its burden of proving defendant guilty beyond a reasonable doubt.

## III

■■ Defendant next argues that the trial court erroneously failed to appoint substitute counsel for defendant when he made a *pro se* oral motion alleging ineffective assistance of counsel, and the court erred in failing to conduct a hearing on these allegations.

The record shows that after evidence in aggravation and mitigation, during which several character witnesses appeared on defendant's behalf, defendant made statements to the court on his own behalf. In essence, those statements alleged ineffective assistance of trial counsel based on a failure to elicit testimony and present evidence that defendant's finger was in a splint and bandage on the day of the murder. Defendant argues that his trial counsel failed to present any evidence about the bandage or splint and that she failed

to cross-examine either Ms. Sanders or Ms. Jordan about this. After defendant's statements, the trial court imposed sentence and did not appoint substitute counsel.

Defendant's reliance on *People v. Krankel* (1984), 102 Ill. 2d 181, 464 N.E.2d 1045, is misplaced. In that case, the supreme court remanded a case for a hearing on a *pro se* motion alleging ineffective assistance of counsel where defense counsel did not investigate or present any alibi defense at all. 102 Ill. 2d 181, 464 N.E.2d 1045.

In order to prevail on an ineffective assistance claim, the defendant must show both that counsel's representation fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the trial would have been different. *Strickland v. Washington* (1984), 466 U.S. 668, 688-694, 80 L. Ed. 2d 674, 693-98, 104 S. Ct. 2052, 2064-68.

There is a strong presumption that counsel's performance falls within the "wide range of professional assistance." (466 U.S. 688, 689, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2065.) The defendant bears the burden of proving that counsel's representations were unreasonable under current prevailing professional norms and that the acts complained of were not sound strategy. (466 U.S. 668, 688-89, 80 L. Ed. 2d 674, 694-95, 104 S. Ct. 2052, 2064-65.) On review, the determination of the reasonableness of trial counsel's actions must be evaluated from trial counsel's perspective at the time of the alleged error, without hindsight, in light of the totality of the circumstances. 466 U.S. 668, 689, 80 L. Ed. 2d 674, 697, 104 S. Ct. 2052, 2065.

█ Decisions on whether or not to call witnesses for the defense are indeed matters of trial strategy and, thus, are beyond the scope of review. (*People v. Reese* (1984), 121 Ill. App. 3d 977, 984, 460 N.E.2d 446.) Defendant has failed to make a showing of substantial prejudice. In the absence of such a showing, we will not take it upon ourselves to second-guess trial counsel's decision regarding the calling or questioning of witnesses. "Effective assistance of counsel refers to competent, not perfect, representation." (*People v. Balfour* (1986), 148 Ill. App. 3d 215, 227-28, 498 N.E. 2d 547, *appeal denied* (1987), 114 Ill. 2d 548.) An examination of the record reveals that defendant's trial counsel acted ably.

█ Any error that may have occurred as a result of the trial court's failure to expressly rule on defendant's *pro se* motion was harmless. There is no evidence of any neglect of defendant's claim. Thus, it is not necessary to remand this cause for a hearing on this claim.

## IV

Defendant asserts, and the State concedes, that the trial court erroneously entered judgment and imposed sentence on three counts of murder where there was only one person killed. Where only one person is murdered, only one conviction may stand. (*People v. Hosty* (1986), 146 Ill. App. 3d 876, 886, 497 N.E.2d 334, *appeal denied* (1987), 113 Ill. 2d 564.) Since the sentence must be imposed on the most serious of the counts (*People v. Torres* (1986), 146 Ill. App. 3d 250, 258, 496 N.E.2d 1060, *appeal denied* (1986), 112 Ill. 2d 591), defendant's conviction and sentence on count I, alleging the intentional and knowing killing of William Davis, is affirmed. The convictions on counts II and III for murder are vacated. The conviction and sentence for attempted armed robbery is affirmed.

Accordingly, the judgment of the circuit court of Cook County is affirmed in part and vacated in part.

Affirmed in part; vacated in part.

SCARIANO, P.J., and STAMOS, J., concur.