THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ALI HASSAN, Defendant-Appellant.

First District (1st Division)   No. 1—91—0418

Opinion filed September 7, 1993.

Daniel E. Radakovich, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Donald T. Lyman, and Cory J. Pollack, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Following a jury trial, defendant Ali Hassan was found guilty of delivery of a controlled substance of less than one gram of cocaine, possession of a controlled substance with intent to deliver more than 15 grams but not more than 100 grams of cocaine, and armed violence. The trial judge sentenced defendant to 15 years in the Illinois State Penitentiary. The issues defendant raises on appeal are: (1) that the evidence discovered in his home should have been suppressed as the result of an unconstitutional, warrantless search; (2) that he was prejudiced by the trial judge's improper refusal to allow into evidence a police tape that impeached the testimony of the arresting officers; (3) that he was denied the effective assistance of counsel; (4) that he was prejudiced by the State's failure to produce a copy of the contingency fund voucher prior to trial; and (5) that he was prejudiced by improper statements made to the jury by the trial judge and the prosecutor.

On August 18, 1989, at approximately 1 p.m., defendant was arrested in the middle of his front yard at 3721 South Wabash by plainclothes police officers after defendant allegedly sold a package of cocaine to an undercover officer. The officers then entered defendant's home and, in "plain view," discovered 104 packets of cocaine, a quantity of money and several firearms.

At the hearing on the motion to suppress, defendant first examined Ilena Rogers, a witness to the arrest. Ilena had lived across the street from defendant at 3716 South Wabash for five years. Ilena stated that, on August 18, 1989, at approximately 12 noon, she was standing on her front porch when she noticed two plainclothes officers enter a house at 3707 Wabash. According to Ilena, the house at 3707 Wabash is known to be a "crack house." She testified that, after about five minutes, the officers exited the crack house with a woman known both as "Debra" and "Queen Bee" and walked with her to defendant's home. One detective stood by defendant's gate while the other walked up to defendant's front door with Debra. The officer who walked up to the front door with Debra hid behind a garbage can next to the door. Ilena testified that Debra knocked on the door, then

began to walk back to the end of the gate, but turned around and returned to the door to knock again.

According to Ilena, after Debra knocked this second time, defendant opened the door. Ilena stated that the officer behind the garbage can jumped from hiding and attempted to pull the door open completely while defendant struggled to close his door. The officer successfully got defendant's door open and defendant ran out of his house. According to Ilena, the officers tackled him in his yard by his front gate and handcuffed him. She stated that the officer who was hiding behind the garbage can then went into defendant's home and defendant and the other officer followed him into the house. They were in the house about 20 minutes before they left with defendant in handcuffs. Ilena was not cross-examined by the State.

Defendant then testified that, on August 18, 1989, at approximately 12 noon, he was lying in bed watching a soap opera when Debra knocked on his door. He stated that he knew her as the "house lady" of the crack house down the street and he told her to get out of his yard. When she started to leave, he went back to watching his soap opera. According to defendant, he did not open the door the first time she knocked and, as far as he could see, she was alone. He testified that a few moments later Debra knocked on his door again and she had $20 in her hand. He said that, as he opened the door to tell her to get out of his yard and that he was not afraid of her or her boy friend, a man jumped up from behind the garbage can and grabbed the door. Defendant testified that he was afraid they were trying to "stick me up 'cause I know they smoke cocaine," so he tried to shut his door. The man was too strong so he "let the door go and ran out the house" toward the street. He thought that if he was going to get shot at least everybody would see it. He testified that he tried to jump the fence, but the man tackled him. Another man then walked up, put a gun to his head and said they were the police.

According to defendant, as soon as they got the handcuffs on him, the officer who had tackled him "got up and ran into the house." Defendant and the other officer then followed. Defendant testified that he did not give the officers permission to enter his house and that the officers "tore up" his house. He stated that he was unaware of the presence of cocaine and that there were no drugs lying out in the open. He further testified that there were several guns in the house. Several he had purchased from a gun shop and two he had taken from his father's apartment after his father died. He stated that at no time did he offer any drugs to Debra or the officer.

On cross-examination, defendant denied that he had had any other visitors at his house all morning. He also testified that he had told Debra and her friends over at the crack house not to set foot in his yard. He said that the officer who jumped out from behind the garbage can did not identify himself. Since the man appeared to be with Debra, defendant assumed he was going to rob him.

Officer Linden Franco was called by the State and testified that, on August 18, 1989, at approximately 12:30 p.m., he and his partners, Michael Jamison and Officer Strickland, were investigating an anonymous informer's tip that a light-skinned black male wearing a blue silk shirt was selling narcotics out of a house at 3721 South Wabash. Franco stated that they set up surveillance and witnessed several people walk up to the house and exchange money for a small package which was given to them through the door by a man fitting the description given by the informer. Franco then identified defendant as the man who was selling the small packages.

Franco stated that he returned to the station to obtain $15 in "contingency fund money" in order to attempt to make a drug buy. He testified that he returned to 3721 South Wabash and knocked on the door. He noticed a black women whom he had never seen before standing on the porch when he arrived. He stated that defendant asked him what he wanted and he responded "what you got?" According to Franco, defendant answered "I got that girl, she going for $15." Franco said that he interpreted defendant's statement to mean that he was selling cocaine for $15 and so he gave defendant the contingency fund money. He testified that defendant closed and locked the door, but that he could see defendant walk back to the bar. According to Franco, he could clearly see numerous small plastic bags with white powder in them on the bar. He stated that defendant picked up one of them, returned to the door, and handed it to him. Franco testified that he then announced that he was a police officer and attempted to grab defendant's wrist. Defendant attempted to pull away and close the door, but Franco was too strong. Defendant pushed the door open, therefore, and ran by Franco into the front yard. Franco stated that he grabbed defendant as he was trying to scale the fence. The other officers then arrived and defendant was placed under arrest.

According to Franco, they then proceeded to enter defendant's home, where they recovered 104 small plastic bags of cocaine and a quantity of money off the bar. He testified that they also recovered a revolver from on top of the bar, another revolver from behind the bar, and a rifle leaning at the side of the door.

On cross-examination, Franco stated that he did not know the name of the informer because the informer wanted to remain anonymous. He also admitted that he and the other officers did not stop any of the persons whom they allegedly saw conducting transactions with defendant. Defense counsel also attempted to impeach Franco by showing that he filled out the contingency fund voucher form after the arrest and not before. Franco stated that he understood that official police department policy prohibits officers from using personal funds to make narcotics transactions, but that he did not use his own money. He explained that he signed his name to a blank contingency fund voucher in order to receive the money. After the arrest, he filled in the form and that is the reason the form indicated that an arrest had already been made. He also testified that he had never heard that a "crack house" was located at 3707 South Wabash and did not know any person named "Debra" or "Queen Bee" who lives at that address.

Defense counsel also pointed out that, in his arrest report, Franco only stated that defendant sold him narcotics. The report fails to indicate that he saw defendant go over to the bar to get the cocaine or that he could see numerous packages of white powder on the bar in plain view. Franco admitted that he did not include in his report the location where he discovered the cocaine or the guns. Defense counsel also pointed out that Franco's report stated that, after selling a package of cocaine to the officer, "[a]bove was arrested and advised of his rights. Further above search revealed 104 small packets of white powder ***; also in his house revealed [several firearms]." Franco denied that his report indicated that, after arresting defendant, he searched his house. He asserted that "[e]verything that I recovered in his house was in plain view." He denied that he "tore-up" defendant's apartment.

Franco's case report indicated that defendant was placed under arrest, sent to the second district for processing, and then further search revealed three handguns, a rifle, and 65 grams of cocaine. Franco explained that "further" did not mean after defendant was taken to the station, but meant "further to the arrest" and was merely written as an inventory.

The State rested upon defense counsel's completion of questioning, and defendant put on Earl Rogers and Everly Frazier, Sr., as rebuttal witnesses. Earl stated that he was Ilena Rogers' cousin and lived with her at 3716 South Wabash. His testimony was virtually identical to that of Ilena Rogers. Everly stated that he had lived at 3715 South Wabash for nine years and was married to defendant's sis-

ter. He testified that he had not seen the arrest, but that after the arrest, he had occasion to enter defendant's home. The State objected and the court sustained the objection, ruling that if the testimony was going to the fact that defendant had a neat house and the police "tossed it," it was irrelevant to the motion. Defense counsel then made an offer of proof as to the disarray that Everly found the house in and then rested. After closing statements by defense counsel and the prosecutor, the trial judge simply stated, "based on the totality of the evidence that I have heard in this case, the motion to suppress the evidence will be denied."

On September 20, 1990, defendant indicated that he wanted to continue *pro se* and the court allowed defense counsel to withdraw. Jury selection was set for the next day on September 21 and the judge had another attorney sit with defendant throughout the process. On Monday, September 24, 1990, when the trial began, the trial judge explained to the jury that defendant had decided to allow the attorney who had been seated with him through jury selection to represent him at trial.

The first witness the State called at trial was Franco. Franco's testimony differed from his testimony at the hearing on the motion to suppress in the following respects: (1) at trial, he stated that the money he received from the contingency fund was prerecorded, whereas at the suppression hearing he stated that he placed his signature on a blank form in order to receive the money and the substance of the form was recorded after the arrest; (2) in addition to testifying that he could see through the doorway numerous packages of cocaine in plain view on the bar, he also said at trial that he saw the sawed-off rifle leaning against the joist of the door; (3) he testified he was only with Jamison and did not mention Strickland; and (4) in contrast to his testimony at the suppression hearing when he testified that one gun was on the bar, one was behind the bar, and a rifle was leaning against the door, at trial he stated that one gun was on the bar, one was sticking up from between the pillows of the couch, and a third gun was underneath a table.

On cross-examination, defense counsel brought out that Franco did not know the name of the alleged informer and never stopped any of the persons who allegedly went up to defendant's door to make suspected drug transactions. Defense counsel also inquired as to how Franco obtained the contingency fund money. Franco responded that he and his partner drove back to the station and filled out a sheet which included the amount of money and the serial numbers of the bills. Defense counsel did not have a copy of this form. The officer

had previously given a copy to the prosecutor at the suppression hearing. A different assistant State's Attorney was prosecuting the case at trial, however, and he did not have a copy of the document either.

Defense counsel also asked Franco if he had ever been to 3707 South Wabash. The trial judge sustained an objection by the prosecutor and refused to allow Franco to answer. Defense counsel asked for a side bar and the judge had the jury removed from the courtroom. Defense counsel informed the judge that he had a police tape which would show that Franco asked for assistance at 3707 Wabash just prior to going to defendant's home. He argued that the tape would illustrate that Franco and his partner arrested Debra at the "crack house" at 3707 Wabash and then brought her to defendant's home to knock on defendant's door and draw him outside. He stated that the tape would contradict Franco's assertion that he had never been to 3707 Wabash. The prosecutor contended that the tape was still irrelevant. The trial judge stated that Franco did not say he was never at 3707 Wabash because the objection to the question was sustained. It appears from the record that the trial judge refused to allow the tape to be used.

Jamison's testimony supported Franco's version of events. He stated, however, that after they entered defendant's home and saw the drugs in plain view on the bar, Franco "continued to search around." He testified that he stayed with the defendant until the transport vehicle arrived. He stated that he only saw the guns after Franco showed them to him, but he did not see them actually recovered. He admitted that Franco searched the house.

On cross-examination, Jamison admitted that, during the alleged drug buy, he could not see the doorway from where he was standing and did not observe his partner make the drug purchase. Additionally, his partner never told him that there was a black female by the door when he got there and, from his vantage point, he did not see one.

Martinique Rutherford, criminalist one with the Chicago police department, analyzed the white powdery substance contained in the packages recovered from defendant's apartment. According to Rutherford, her tests revealed that the substance was cocaine.

The State rested and the defense called three witnesses. Ilena Rogers testified consistently with her testimony at the suppression hearing. Earl Rogers' testimony was also identical with his testimony at the suppression hearing. On cross-examination, however, the prosecutor brought out that Earl had recently pleaded guilty to burglary of an automobile. Additionally, Earl admitted that Jamison was the officer who arrested him.

Defendant's testimony also was consistent with the testimony he gave at the suppression hearing. He stated that to his knowledge no drugs were in his home and he did not see Franco retrieve any drugs. He also stated that Franco never offered him $15 for drugs. He testified that his rifle was in a bag in the closet, another gun was in his tool box, another was in a coat in the closet, and the last was broken and did not even work. He said that the $305 was not on the bar, but in the tool box with one of the guns.

Defendant's first contention on appeal is that the evidence discovered in his home should have been suppressed as the fruit of an unconstitutional, warrantless search. He argues that, even assuming Franco did see cocaine in plain view on the bar, the evidence should have been suppressed because Franco had no right to physically enter his home without a warrant. The State asserts that defendant has waived this issue on appeal by failing to raise it at the suppression hearing, during trial, or with specificity in a post-trial motion. Notwithstanding waiver, the State maintains that the warrantless entry into defendant's home and the subsequent seizure of the evidence lying in "plain view" was constitutionally permissible due to (a) the fact that the police action did not constitute a search and, alternatively, (b) "exigent circumstances" existed which justified the entry.

As a general rule, issues not raised during trial and renewed in a timely post-trial motion are waived on appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 187, 522 N.E.2d 1124, 1130; *People v. Holloway* (1981), 86 Ill. 2d 78, 91, 426 N.E.2d 871, 877.) A review of the proceedings at the suppression hearing reveals that defendant's position was that he did not sell drugs to Franco and that there were no drugs lying in plain view. Defense counsel attempted to show that the officers used a third party named Debra who was known to defendant to gain entry to defendant's home and that the officers "tore up" his house looking for evidence. Clearly, defendant did not argue that the officers' warrantless entry mandated the suppression of the evidence they discovered in his home. Moreover, defendant did not raise this issue with specificity in his post-trial motion for a new trial, which merely alleged that "this Honorable Court erred in denying defendant's motion to suppress evidence." General references in a post-trial motion to alleged trial errors without specific factual detail are insufficient to preserve that issue for review. (*People v. McGrew* (1984), 128 Ill. App. 3d 464, 469, 470 N.E.2d 1157, 1161.) Therefore, defendant has waived this issue on appeal.

■ However, we may review plain errors affecting substantial rights even though they were not properly preserved (134 Ill. 2d R.

615(a)) if, as a result of the error, an innocent person may have been convicted or the error was of such magnitude that the accused was denied a fair trial. (*People v. Herrett* (1990), 137 Ill. 2d 195, 209-10, 561 N.E.2d 1, 7-8, citing *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77, 404 N.E.2d 233, 238.) Since the warrantless entry of a person's home is "the chief evil against which the wording of the fourth amendment is directed," we believe it appropriate to address this issue under the circumstances of this case. *People v. Spicer* (1987), 163 Ill. App. 3d 81, 87, 516 N.E.2d 491, 496, citing *Payton v. New York* (1980), 445 U.S. 573, 586, 63 L. Ed. 2d 639, 651, 100 S. Ct. 1371, 1380.

It is apparent that without the weapons and cocaine which the officers seized upon their entry into defendant's home, defendant would not have been charged with either armed violence or possession of a controlled substance with intent to deliver more than 15 grams but not more than 100 grams of cocaine. The fourth amendment to the United States Constitution provides that "[t]he right of the people to be secure in their *** houses *** against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." (U.S. Const., amend. IV.) The "chief evil" against which the fourth amendment was intended to protect the people was the "physical entry of the home." (*Spicer*, 163 Ill. App. 3d at 87, 516 N.E.2d at 496, citing *Payton*, 445 U.S. at 585, 63 L. Ed. 2d at 650, 100 S. Ct. at 1379.) Therefore, any search or seizure within a home without a warrant is presumptively unreasonable. (*Payton*, 445 U.S. at 586, 63 L. Ed. 2d at 651, 100 S. Ct. at 1380.) The *Payton* Court recognized "the long-settled premise that, absent exigent circumstances, a warrantless entry to search for weapons or contraband is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within." (*Payton*, 445 U.S. at 587-88, 63 L. Ed. 2d at 651-52, 100 S. Ct. at 1381.) "[N]o amount of probable cause can justify a warrantless search or seizure absent 'exigent circumstances.' " (*Coolidge v. New Hampshire* (1971), 403 U.S. 443, 468, 29 L. Ed. 2d 564, 584, 91 S. Ct. 2022, 2039.) If an officer merely needed probable cause in order to search a suspect's home, " 'the provisions of the Fourth Amendment would become empty phrases, and the protection it affords largely nullified.' " (*People v. Kelley* (1982), 104 Ill. App. 3d 51, 54, 432 N.E.2d 630, 632, quoting *Jones v. United States* (1958), 357 U.S. 493, 497-98, 2 L. Ed. 2d 1514, 1518-19, 78 S. Ct. 1253, 1256-57.) The Supreme Court also has recognized certain narrow exceptions to the warrant requirement besides the existence of "exigent circum-

stances," such as the "protective sweep" (*Maryland v. Buie* (1990), 494 U.S. 325, 108 L. Ed. 2d 276, 110 S. Ct. 1093) and the "search incident to arrest." *Chimel v. California* (1969), 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034.

In this case, defendant was arrested outside of his home in his front yard. He does not contest that the police possessed probable cause and the State does not assert that defendant consented to the search of his home. Therefore, if the entry of defendant's home by the police fell within the protection of the fourth amendment, then the evidence obtained should have been suppressed as the result of an unconstitutional, warrantless "search and seizure" unless there existed either "exigent circumstances" or some other exception to the warrant requirement which would justify the police action in this case.

First, the State argues that defendant's motion to suppress properly was denied because the police action did not constitute a "search" and the seizure of the evidence was reasonable. The State latches onto general language explaining the nature of fourth amendment privacy protections from cases inapplicable to the facts in this situation (see *Illinois v. Andreas* (1983), 463 U.S. 765, 771, 77 L. Ed. 2d 1003, 1010, 103 S. Ct. 3319, 3324; *Katz v. United States* (1967), 389 U.S. 347, 19 L. Ed. 2d 576, 88 S. Ct. 507; *People v. Beroukas* (1981), 98 Ill. App. 3d 990, 425 N.E.2d 5) and interweaves it with cases dealing with the "plain view" doctrine (see *Texas v. Brown* (1983), 460 U.S. 730, 75 L. Ed. 2d 502, 103 S. Ct. 1535; *Coolidge*, 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022) in an attempt to assert that when "defendant opened his door and thereby exposed his home's interior to view by any member of the public that might happen by on the sidewalk," he relinquished any expectation of privacy he may have had in the visible interior of his home. As such, "there was no police action which was prohibited by the Fourth Amendment."

The State contends that these familiar words from *Katz* support its argument: "the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." (*Katz*, 389 U.S. at 351, 19 L. Ed. 2d at 582, 88 S. Ct. at 511.) We accept that defendant may have relinquished any legitimate expectation of privacy he had in the narcotics which he left exposed to the "plain view" of the public, but this does not change the fact that "the police may not enter and make a warrantless seizure" of evidence absent "exigent circumstances" or some other exception to the warrant requirement. The State informs us that it realizes that the "plain view"

doctrine is not an independent exception to the warrant requirement (*Brown*, 460 U.S. at 738, 75 L. Ed. 2d at 511, 103 S. Ct. at 1541), but asserts that it is not relying solely on the doctrine to justify the police entry into defendant's home. We believe that is exactly what the State is doing.

■ The State has blurred the difference between the "plain view" doctrine which permits the seizure of an object, and the mere observation of an object left in plain view on private property. "[P]lain view *alone* is never enough to justify the warrantless seizure of evidence." (Emphasis in original.) (*Coolidge*, 403 U.S. at 468, 29 L. Ed. 2d at 584, 91 S. Ct. at 2039.) The doctrine "supplements" a prior valid reason for being present and permits the warrantless seizure of evidence in "plain view" because it does not constitute a general, intrusive invasion of a person's privacy. (*Coolidge*, 403 U.S. at 466-67, 29 L. Ed. 2d at 583-84, 91 S. Ct. at 2038-39.) The three requirements for a valid warrantless seizure under the "plain view" doctrine are: (1) that the officer must not have violated the fourth amendment in arriving at the location from which he can plainly see the evidence; (2) that it must be "immediately apparent" that the object in "plain view" is evidence; and (3) "not only must the officer be lawfully located in a place from which the object can be plainly seen, *but he or she must also have a lawful right of access to the object itself.*" (Emphasis added.) (*Horton v. California* (1990), 496 U.S. 128, 136-37, 110 L. Ed. 2d 112, 123, 110 S. Ct. 2301, 2308.) If the officer's access is impeded, such as by the warrant requirement, his observation of the object in plain view may still be sufficient to serve as the basis for the probable cause needed to obtain that warrant. *Brown*, 460 U.S. at 738 n.4, 75 L. Ed. 2d at 511 n.4, 103 S. Ct. at 1541 n.4.

In this case, Franco was lawfully in the location from which he could see the packages of white powder and their incriminating nature was "immediately apparent." However, Franco did not have a lawful right of access to the cocaine itself because to make the seizure he had to cross the "firm line" that "the Fourth Amendment has drawn *** at the entrance to the house." (*Payton*, 445 U.S. at 590, 63 L. Ed. 2d at 653, 100 S. Ct. at 1382.) At best, his observation was sufficient to establish the probable cause necessary to obtain a search warrant. As the Supreme Court has recently reaffirmed:

" '[i]ncontrovertible testimony of the senses that an incriminating object is on premises belonging to a criminal suspect may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter

and make a warrantless seizure. [Citations.]' " *Horton*, 496 U.S. at 137 n.7, 110 L. Ed. 2d at 123 n.7, 110 S. Ct. at 2308 n.7, quoting *Coolidge*, 403 U.S. at 468, 29 L. Ed. 2d at 584, 91 S. Ct. at 2039.

It may seem needlessly inconvenient to require an officer to go through the motions of obtaining a search warrant for evidence which is plainly visible simply because such evidence lies just inside the entranceway to the suspect's home. The distinction between a warrantless seizure in a public place, however, and such a seizure in a private home is significant. (*Payton*, 445 U.S. at 587, 63 L. Ed. 2d at 651, 100 S. Ct. at 1380.) The seizure of property in plain view in public " 'involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the property with criminal activity.' " (*Brown*, 460 U.S. at 738, 75 L. Ed. 2d at 511, 103 S. Ct. at 1541, quoting *Payton*, 445 U.S. at 587, 63 L. Ed. 2d at 651, 100 S. Ct. at 1380.) Such a seizure in a person's home, however, implicates the fourth amendment's privacy protections. (*Brown*, 460 U.S. at 738, 75 L. Ed. 2d at 511, 103 S. Ct. at 1541.) As Justice Jackson stated in *Johnson v. United States* (1948), 333 U.S. 10, 14, 92 L. Ed. 436, 440, 68 S. Ct. 367, 369, "[w]hen the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman" who is "engaged in the often competitive enterprise of ferreting out crime." If the search of a suspect's home could be based upon a police officer's own determination that probable cause existed, "the provisions of the Fourth Amendment would become empty phrases, and the protection it affords largely nullified." (*Kelley*, 104 Ill. App. 3d at 53-54, 432 N.E.2d at 632, quoting *Jones*, 357 U.S. at 497-98, 2 L. Ed. 2d at 1518-19, 78 S. Ct. at 1256-57.) Therefore, unless the State can show "exigent circumstances" or another exception to the warrant requirement, the evidence seized as a result of the officers' warrantless entry and seizure must be suppressed.

"EXIGENT CIRCUMSTANCES"

A police officer may make a warrantless entry into a suspect's home if exigent circumstances exist which would justify the action under the fourth amendment, *i.e.*, " 'there is a compelling need for official action and no time to secure a warrant.' " (*People v. Abney* (1980), 81 Ill. 2d 159, 173, 407 N.E.2d 543, 549, quoting *Michigan v. Tyler* (1978), 436 U.S. 499, 509, 56 L. Ed. 2d 486, 498, 98 S. Ct. 1942, 1950.) The "guiding principle" in determining whether exigent circumstances exist is "reasonableness" and each case must be de-

cided based upon its own facts. *People v. Yates* (1983), 98 Ill. 2d 502, 515, 456 N.E.2d 1369, 1376; *Abney*, 81 Ill. 2d at 173, 407 N.E.2d at 549.

The supreme court in *Abney* listed numerous factors to be considered when determining whether exigent circumstances existed such that a warrantless entry of a suspect's home was reasonable. The *Abney* factors include: (1) the need for prompt action; (2) the absence of any deliberate or unjustified delay by the officers during which time a warrant could have been obtained; (3) the belief that a suspect was armed and exhibited some sign of a violent character; (4) the officers were acting on a clear showing of probable cause based on reasonably trustworthy information; (5) the defendant was clearly identified as the perpetrator; (6) the officers had a strong reason to believe that the defendant was in the premises entered; and (7) the entry was peaceful. (*Abney*, 81 Ill. 2d at 169-72, 407 N.E.2d at 547-49; see *People v. Hoddenbach* (1988), 169 Ill. App. 3d 499, 503, 525 N.E.2d 888, 891.) Three years later in *Yates* (98 Ill. 2d at 515, 456 N.E.2d at 1376), the court listed additional factors to consider. These factors include: (1) a grave offense is involved, particularly one of violence; (2) a likelihood exists that the suspect will escape if not swiftly apprehended; and (3) the time of arrest is a reasonable time of the day. (*Yates*, 98 Ill. 2d at 515, 456 N.E.2d at 1376; see *Hoddenbach*, 169 Ill. App. 3d at 503-04, 525 N.E.2d at 891.) The *Yates* court stressed that these factors are merely guidelines and should not be viewed as "cardinal maxims to be rigidly applied in each case." (*Yates*, 98 Ill. 2d at 515-16, 456 N.E.2d at 1376.) Clearly, some factual scenarios will fit these factors more comfortably than others.

After considering the facts of this case under the *Yates* and *Abney* factors, we do not believe that exigent circumstances existed to justify the warrantless entry into defendant's home. In this case, unlike in most cases we are aware of in this area, the suspect was in custody *prior* to the warrantless entry. Most of the factors to be considered appear to apply best to situations where the entry is for the purpose of apprehending the suspect. As such, the majority of factors listed above cannot be given much weight in our analysis.

We believe that there was probable cause to believe that a quantity of cocaine was on the premises, but there was no "emergency" which required a quick response. The officers could have obtained a warrant without the risk that the suspect would escape or harm others. Additionally, he was suspected of selling drugs, not of committing a crime of violence. In short, the police action here was not reasonable because there was no need for swift action.

The State argues that the destructibility of the narcotics created exigent circumstances and, as such, the officers were justified in entering defendant's home. In *People v. Ouellette* (1979), 78 Ill. 2d 511, 516, 401 N.E.2d 507, 510, the supreme court expressly declined to establish a rule that the easy disposability of drugs creates exigent circumstances when drugs are the subject of the investigation. If the destruction of narcotics is the primary motivation for the warrantless entry, the police "must have particular reasons to believe that the evidence will be destroyed" before exigent circumstances will arise. *People v. Patrick* (1981), 93 Ill. App. 3d 830, 833, 417 N.E.2d 1056, 1059.

In this case, the police did not have any particular information which would have led them to believe that the evidence would be destroyed before a warrant was obtained. The information they possessed was that one man was selling drugs from 3721 South Wabash. Subsequently, this man was placed under arrest. During their surveillance, the officers did not see anyone other than defendant exchanging packages for money. While one officer went to obtain a search warrant, the other could have stayed behind with other officers to watch the suspected narcotics through the doorway. It was not impractical for these officers to have obtained a search warrant and, therefore, "[w]e decline to hold that an arrest on the street can provide its own 'exigent circumstance' so as to justify a warrantless search of the arrestee's house." *Vale v. Louisiana* (1970), 399 U.S. 30, 35, 26 L. Ed. 2d 409, 414, 90 S. Ct. 1969, 1972.

"SEARCH INCIDENT TO ARREST"

The State also maintains that the evidence was lawfully seized as incident to an arrest under *Chimel v. California* (1969), 395 U.S. 752, 23 L. Ed. 2d 685, 89 S. Ct. 2034. The State contends that the officer was "legitimately in defendant's doorway" attempting to arrest him when the officer observed the narcotics. The State argues that we should not allow defendant's attempted escape to affect the legality of the seizure.

In *Chimel*, the Supreme Court established that, upon lawfully arresting a person in his home, the police may search the area within the suspect's "immediate control" from which he might obtain a weapon or destroy evidence against him. If Franco was lawfully within defendant's home when attempting to place him in custody, then the seizure of the narcotics would have been valid. However, Franco was never within defendant's home. The testimony of all involved shows that Franco was outside trying to pull the door open when defendant ran past him into his yard. At the time defendant

was arrested, Franco had never lawfully been inside defendant's home. Therefore, the *Chimel* exception to the warrant requirement does not provide a basis for the admissibility of the evidence.

"PROTECTIVE SWEEP"

Finally, the State argues that the police were lawfully on defendant's premises while conducting a "protective sweep." In *Maryland v. Buie* (1990), 494 U.S. 325, 334, 108 L. Ed. 2d 276, 286, 110 S. Ct. 1093, 1098, the Supreme Court held that an officer, after lawfully arresting a suspect in his home, may make a "protective sweep" of the premises to check for other dangerous individuals if the officer possesses specific "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." The Illinois Supreme Court has recognized the permissibility of a "protective sweep" of a suspect's house " 'even though the arrest itself was achieved without entry.' " *(People v. Free* (1983), 94 Ill. 2d 378, 396-97, 447 N.E.2d 218, 227, quoting 2 W. LaFave §6.4(c), at 431 (1978).) An officer's suspicion, however, must be based "upon something more concrete than the mere physical capacity of a structure to harbor unseen occupants." *(United States v. Wiga* (9th Cir. 1981), 662 F.2d 1325, 1330.) "[B]are suspicion unsupported by articulable facts will not justify a protective search." *Wiga*, 662 F.2d at 1330.

In this case, there were no specific facts which the officers could articulate which would lead them to believe there was another individual on the premises who posed them harm. The informer told them that one male was selling drugs. During their surveillance, the officers did not observe any person other than the suspect sell drugs, nor did they observe anyone else enter or leave the house. When defendant was arrested, he did not inform them that anyone else was in the house, nor was it generally known to the officers that there were other people in the house. Therefore, the officers could not articulate any specific facts that would lead them to believe other people were on the premises other than that the physical capacity of the structure could harbor unseen persons.

Franco did testify that, when he was struggling to get defendant's door open, he observed a rifle leaning against the door joist. In *Free*, the Illinois Supreme Court stated that after an arrest without entry " 'the police may have good reason to doubt whether they can withdraw from the area with their prisoner without being fired upon, in which case an entry and "protective sweep" is justified.' " *(Free*,

94 Ill. 2d at 397, 447 N.E.2d at 227, quoting 2 W. LaFave, Search & Seizure §6.4(c), at 431 (1978).) In *Free*, however, defendant had used a gun during the commission of his crimes. Several factors the *Free* court considered in concluding that a protective sweep was reasonable were that (1) when defendant was arrested outside his house, he did not have the gun, and (2) an officer testified that he saw someone in the house at both the front and back windows before defendant came out and he could not be sure that both were the same person. Therefore, the court held that a "demonstrable potential for danger clearly existed" which justified the protective sweep. (*Free*, 94 Ill. 2d at 397, 447 N.E.2d at 227.) In *People v. Parent* (1986), 148 Ill. App. 3d 957, 959, 500 N.E.2d 80, 81, the appellate court also upheld a "protective sweep" conducted after a defendant was arrested outside his home. In *Parent*, the officers could see weapons in plain view at the same time that another occupant of the premises told them that there were no other people or weapons in the house.

In this case, a rifle was seen in the house by Franco, but there was absolutely no evidence that there was anyone present in the house to fire it. Therefore, we cannot hold that this was a valid protective sweep.

A trial judge's determination on a motion to suppress will not be disturbed unless it is manifestly erroneous. (*Hoddenbach*, 169 Ill. App. 3d at 506, 525 N.E.2d at 893.) Under the facts of the instant case, the police made an unconstitutional, warrantless entry into defendant's home and, as a result, the evidence discovered must be suppressed. Consequently, the defendant's convictions for possession of a controlled substance with the intent to deliver and armed violence must be reversed.

Defendant also contends on appeal that the trial judge committed reversible error and denied him a fair trial when he refused to allow defense counsel to impeach the officers with a police recording of their radio calls to the station near the time of defendant's arrest. The State argues that the tape was both irrelevant and inadmissible hearsay.

The State's theory of the events surrounding defendant's arrest was that the officers received an anonymous tip that defendant was selling cocaine out of his home. They conducted surveillance, went back to the station to obtain money for a buy, then arrested defendant after successfully making a drug purchase. At the time of the purchase, the officers saw narcotics lying out in plain view in his home. Defendant's theory at the suppression hearing and at trial, on the other hand, was that the officers did not receive an anonymous tip,

conduct surveillance, or make an attempted drug buy. Defendant attempted to show through his testimony and the testimony of Ilena and Earl that the officers merely pulled Debra out of the crack house down the block at 3707 Wabash and attempted to use her to gain access to defendant's home. Defendant also wanted the jury to believe that there were no drugs or weapons in plain view, but that the officers "tore up" his apartment in their search.

In presenting his case at trial, defense counsel attempted to impeach Franco with a police tape recording of radio calls the officers made to the station before and after the defendant's arrest. On the tape, the officers requested assistance at 3707 Wabash just prior to calling for assistance at the defendant's home. A few calls later, the officers called for a transport to be sent to defendant's home. The officer on the tape, however, indicated there was no rush. The officer stated, "Tell him to take his time. We're still searchin'."

When defense counsel asked Franco whether he had ever been to 3707 South Wabash, a known "crack house," the prosecutor objected and the judge sustained the objection. Subsequently, the attorneys and the judge had a discussion out of the presence of the jury. The judge expressed his belief that the tape was irrelevant. Apparently, the parties went into chambers to hear the tape off the record. When the proceedings resumed, the tape was never mentioned again.

Both during the suppression hearing and later during the defense presentation at trial, both Ilena and Earl Rogers testified that the officers had first stopped at the crack house at 3707 Wabash before going to defendant's home with a woman named Debra. They testified that the officers had Debra knock on defendant's door while Franco hid behind a garbage can. According to their testimony, when defendant opened his door, Franco jumped up and grabbed for defendant. Franco had testified at the suppression hearing that he did not know Debra and that he had never been to 3707 South Wabash.

First, the tape was not irrelevant. It lent credence to defendant's theory and directly supported the testimony of all his witnesses. Additionally, it contradicted the testimony Franco gave at the suppression hearing that he had never been to 3707 South Wabash. Had counsel been permitted to proceed with his line of questioning, it may have contradicted the officers' trial testimony. Moreover, as it is, the statement on the tape that the transport driver should not hurry because "[w]e're still searchin' " substantially contradicts Franco's testimony that "everything that I recovered in his house was in plain view." Clearly, this statement was not irrelevant.

Additionally, it was not inadmissible hearsay. Hearsay is any oral or written evidence of an out-of-court statement offered to establish the truth of the matter asserted in the statement and is inadmissible. (*People v. Rogers* (1980), 81 Ill. 2d 571, 577, 411 N.E.2d 223, 226.) The tape was not offered by defendant as substantive evidence to prove the truth of the matters asserted on the tape. It was offered as impeachment evidence to contradict the officers' in-court testimony and to undermine the officers' credibility. Therefore, the tape recording was relevant and admissible impeachment evidence.

■ The question is whether the erroneous exclusion of this recording was so prejudicial to defendant's case that it denied him a fair trial. Clearly, the statements on the tape would have severely undermined the testimony of the police officers and reduced their credibility in the eyes of the trier of fact while at the same time bolstering the testimony of defendant's witnesses. We cannot say that this error was harmless beyond a reasonable doubt and believe that defendant was substantially prejudiced by the trial judge's erroneous refusal to allow the tape into evidence. There is a reasonable probability that, had the jury heard this tape, it would have concluded that the officers never purchased cocaine from defendant and did not find the 104 packages of cocaine and the three handguns and one rifle in plain view in defendant's living room. Consequently, we must reverse defendant's conviction of delivery of a controlled substance and remand for a new trial on this count. In light of our disposition of the above two issues, we need not address defendant's remaining arguments.

For the foregoing reasons, we reverse defendant's convictions for possession of a controlled substance with intent to deliver and armed violence because the police obtained the evidence necessary for these convictions through an unconstitutional, warrantless search. We also reverse defendant's conviction of delivery of a controlled substance and remand for a new trial on this count on the ground that defendant was substantially prejudiced by the trial court's improper refusal to allow into evidence a police tape which contradicted the testimony of the arresting officers.

Reversed and remanded.

MANNING, P.J., and O'CONNOR, J., concur.