2023 IL App (1st) 220520

No. 1-22-0520

Opinion filed June 30, 2023.

First Division

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 8485 |
| | ) | |
| DENNIS CUMMINGS, | ) | The Honorable |
| | ) | Timothy J. Joyce, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE LAVIN delivered the judgment of the court, with opinion.
Justices Hyman and Coghlan concurred in the judgment and opinion.

**OPINION**

¶ 1    Following a jury trial, defendant Dennis Cummings was found guilty of aggravated

criminal sexual assault and aggravated kidnapping, then sentenced to an aggregate term of 24

years' imprisonment. On appeal, defendant contends the trial court erred in denying his motion

to quash arrest and suppress evidence because police lacked probable cause for his arrest and his

DNA was then seized pursuant to an invalid warrant. Defendant further maintains the court erred

in admitting other-crimes evidence because there was no proof that another crime had been

committed. He also contends the court failed to balance the probative versus prejudicial value of that evidence, as required. Last, defendant contends the trial court was biased against him and acted as a prosecutor rather than a neutral arbiter. We affirm.

¶ 2                                            BACKGROUND

¶ 3     At trial, the State presented evidence that one winter evening in 2019, under the train tracks on the south side of Chicago, defendant vaginally and orally raped the victim, A.J., ejaculating in her mouth. The victim was unable to identify defendant, but he nevertheless was arrested after police noted an association between his DNA, already in the national DNA database, and the DNA profile collected from the victim's mouth immediately after the crime. The Illinois State Police DNA database is part of a larger national criminal justice database called the Combined DNA Index System (CODIS). See 730 ILCS 5/5-4-3(f) (West 2018); 410 ILCS 70/6.4 (West 2018); 20 Ill. Adm. Code 1285.20 (2012); see also *Maryland v. King*, 569 U.S. 435, 444-45 (2013) (describing CODIS). Police then performed a buccal or cheek swab on defendant, pursuant to a signed and dated warrant, and this confirmed the presence of defendant's DNA in the victim's oral swab.

¶ 4     Prior to trial, and while represented by counsel, defendant filed a motion to quash arrest and suppress evidence, arguing that he was illegally arrested inside his home on July 14, 2020, absent probable cause, a warrant, and exigent circumstances. He maintained the exclusionary rule required suppression of all evidence resulting from the arrest, including any testing done. At the hearing on the motion, Chicago police officer Michael Pettis testified that he worked for the department's Fugitive Apprehension Unit, targeting suspects subject to arrest based on probable cause or a warrant, and he was charged with finding and apprehending defendant. Although Officer Pettis did not have a warrant to arrest defendant or search his home, Officer Pettis

previously had learned from another officer that, according to CODIS, there was a "DNA hit" to defendant in A.J.'s rape case. Officer Pettis had also learned that defendant previously had been arrested for gun possession and allegedly was armed during the sexual assault. Officer Pettis and his partner went to defendant's southside home, surveilled it, and arrested defendant just outside his home before calling additional officers to transport defendant. None of the officers entered defendant's home.

¶ 5       Soon after this hearing and following detailed admonitions by the court, defendant fired his private defense attorney and chose to proceed *pro se*. Defendant withdrew the original motion to quash arrest and suppress evidence and, in its place, filed a *pro se* "Motion to Release Defendant from Custody Immediately," appending the transcript of Officer Pettis's testimony. Defendant did not present any other evidence in support of his motion but rather reiterated arguments that he was arrested inside his home absent probable cause, a warrant, and exigent circumstances and the exclusionary rule therefore applied. He maintained officers "were not acting under any color of the law but criminally as kidnappers" in violation of the fourth amendment. Following extensive argument and interruptions by defendant, the court denied his motion to suppress. The court found that, even crediting defendant's argument that the arrest took place in his home without a warrant, defendant still was not entitled to relief. Citing *New York v. Harris*, 495 U.S. 14 (1990), the court found there was no evidence seized at that time, and therefore nothing to suppress.

¶ 6       Although not presented in the State's case-in-chief at trial (see *infra* ¶¶ 37-41), the State submitted a pretrial motion to submit other-crimes evidence asserting that in 2018 defendant forced a woman named C.D., whom he met on a social media dating site, to have oral sex, and similarly ejaculated in her mouth. See 725 ILCS 5/115-7.3 (West 2018). C.D. then went to the

hospital, where she outcried and a rape kit was performed. C.D. made a police report identifying defendant as the offender, although she ultimately declined to participate in any further investigation, and the case was suspended. The record contains a Chicago police "case supplementary report" (JB230625) reflecting these facts. The record also established that a male DNA profile (defendant's) was found on the neck swabs from C.D. Via her rape kit, defendant's DNA therefore was apparently entered into the Illinois State Police DNA database and then uploaded to CODIS.

¶ 7      As to the other-crimes motion, the State argued the two offenses were close in time (eight months apart); similar in nature, insofar as both victims were young, raped orally with defendant ejaculating in their mouths, and in secluded areas absent the victims' consent; and the offenses were relevant. Notably, the motion did not focus on the admission of DNA evidence under the other-crimes theory but rather on the admission of the facts described by C.D. in the police report. In response to this proffer, defendant argued that he never gave his DNA "to anybody" prior to July 2020, and this was a "fraud upon the court." The court allowed the State's motion.

¶ 8      Defendant, for his part, filed two pretrial motions to substitute the trial judge, Timothy J. Joyce, for cause. Extensive hearings and argument by defendant before Judge Erica L. Reddick followed. Contrary to defendant's arguments otherwise, Judge Reddick found there was no prejudice or bias by Judge Joyce. Rather, evidence showed he was fair and patient with defendant. In spite of this, defendant accused Judge Joyce of being a "criminal" and conspiring with the State multiple times, even as the cause proceeded before the jury.

¶ 9      At trial, the victim, A.J., testified that around 6 p.m. on January 15, 2019, she was walking to her south side home after visiting a convenience store, when she saw a man wearing a hoodie, black pants, and a mask revealing only his eyes. He stopped A.J. under an overpass by

the train tracks and demanded money while holding a silver revolver. A.J. said that she had no money, and the man responded, "you got something else you can do to pay." With a gun still in hand, he then led her up to the train tracks, made her disrobe, and with her back to him tried to insert his penis inside her vagina. When that failed, he forced his penis into A.J.'s mouth, made her give him oral sex, and ejaculated. Since defendant still had a gun, A.J. assured him she would not call the police, and he left.

¶ 10    A.J. then ran home and called the police, who responded shortly thereafter, and she spoke to them about the sexual assault. The officers, on surveying the crime scene, noticed fresh footprints in the snow near the train. A.J. was transported to the hospital that same evening of January 15. There, a criminal sexual assault evidence collection kit, more commonly known as a rape kit, was administered. See 410 ILCS 70/1a (West 2018).[1] This entailed collecting, among other things, vaginal swabs, oral swabs, a buccal swab of the inside of A.J.'s cheek for DNA reference, and her clothes for examination. In May 2020, A.J. viewed a photographic array, but she identified a man other than defendant.

¶ 11    A.J.'s boyfriend testified that he awoke on the evening in question, finding A.J. crying. She stated she was on her way back from the store when a man took her at gunpoint to the train tracks and raped her, trying first vaginally and then raping her orally.

¶ 12    Chin Hong Shek, a forensic DNA analyst, testified that he worked for Bode Technology, contracted by the Illinois State Police, and was assigned to conduct DNA analysis on the evidence collected from A.J.'s rape kit, including oral, face, and neck swabs. The lab also

---

[1]Section 1a of the Sexual Assault Survivors Emergency Treatment Act (410 ILCS 70/1a (West 2018)) provides that " 'Illinois State Police Sexual Assault Evidence Collection Kit' means a prepackaged set of materials and forms to be used for the collection of evidence relating to sexual assault. The standardized evidence collection kit for the State of Illinois shall be the Illinois State Police Sexual Assault Evidence Collection Kit."

collected a "DNA standard" from A.J. herself. Sperm from the oral swabs yielded a DNA profile from a male contributor. According to standard practice, Shek forwarded these results and the physical evidence to the Illinois State Police.

¶ 13   Chicago police Detective Sherry Odunsi-Crawl testified that after A.J.'s rape kit was tested at the crime lab, a "DNA association" with defendant emerged, making him the "named offender" in A.J.'s rape case.[2] Detective Odunsi-Crawl explained that, "There was a DNA association with another case[,] with him being the named offender in that case," as well. Defendant was subsequently arrested on July 14, 2020. Fifteen days later, on July 31, 2020, Detective Odunsi-Crawl obtained a separate buccal swab from defendant to confirm the association between his DNA and that of A.J.'s.

¶ 14   Officer Pettis testified at trial much the same as at the suppression hearing, adding that defendant's home was several blocks south of the crime scene. Instead of testifying about the "DNA hit," as he had previously, Officer Pettis testified that defendant was "a named offender" in the case being investigated and that Officer Pettis had a photo of defendant, which came from the Chicago Police Department's system. He again testified that the officers did not go into defendant's home or draw weapons when they arrested defendant.

¶ 15   Megan Neff, a forensic scientist with the Illinois State Police, testified that she received a sealed buccal swab collected from defendant and that a DNA profile emerged that was suitable for comparison purposes. Neff also received the DNA data from the oral and neck swabs from Bode Technology. Neff then compared defendant's DNA profile to the DNA data extracted from

---

[2]In a prior pleading, the State asserted that the CODIS association was discovered on May 13, 2020, and A.J. viewed the photo array on May 20, 2020.

the oral swabs, taken from A.J.[3] Following review of the two profiles, Neff concluded that defendant's DNA profile was present in the sperm fraction collected from A.J.'s oral swab and that this DNA profile would be expected to occur in approximately one in 1.9 quintillion (18 zeroes) unrelated individuals. Her opinions were based on her education, training, experience, and methodologies, which were generally accepted in the scientific community. In addition, she testified proper controls were used and a proper chain of custody had been maintained. In response to the court's question of "[w]ould this be termed a match?" Neff stated that defendant could not be "e[x]cluded." She testified a "match" only occurred if there was a "complete profile" analyzed.

¶ 16    The State rested, and defendant rested without presenting any evidence. The jury found defendant guilty of aggravated kidnapping and two counts of aggravated criminal sexual assault (penis to mouth and penis to vagina). Defendant attempted to file a motion for a new trial, but the court struck the motion after determining it was not properly signed by defendant and appeared to have been prepared and filed by someone who was not a licensed attorney. Defendant was sentenced to 10 years and 8 years for the aggravated criminal sexual assault counts and 6 years for the aggravated kidnapping count, all to run consecutively, for a total of 24 years' imprisonment.[4] In addition, the court sentenced defendant to an additional 60 days' imprisonment after finding defendant in direct criminal contempt of court for his numerous interruptions during jury selection. The court also entered a civil no-contact order against defendant (and defendant through third parties) after the State noted the victim had been

---

[3]The State specifically asked Neff: "And did you compare the DNA profile from Dennis Cummings to the male DNA profile identified from the sperm fraction from the oral swabs in this case?" Neff responded, yes.

[4]The State nol-prossed the separate gun charge against defendant in No. 19-CR-11944.

contacted on Facebook by someone requesting that the charges be dropped in this case, or something to that effect.

¶ 17    Defendant appealed.

¶ 18                                    ANALYSIS

¶ 19    As set forth, defendant raises a number of claims on appeal related to his suppression motion, evidentiary errors, and judicial bias. The State at the outset maintains defendant forfeited these claims by failing to object both at trial and in a posttrial motion. See *People v. Jackson*, 2022 IL 127256, ¶ 15 (noting a trial objection and a posttrial motion are required to preserve an issue on appeal). We agree. We note that the trial court struck defendant's posttrial motion because, in filing it, defendant utilized the services of an unlicensed attorney, which is prohibited. See *Downtown Disposal Services, Inc. v. City of Chicago*, 2012 IL 112040, ¶ 19. On appeal, defendant does not challenge the court's finding or ask that his posttrial motion be reinstated. Accordingly, defendant has forfeited his claims.

¶ 20    Defendant nevertheless maintains that we may consider these unpreserved errors under the plain error doctrine, where the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process regardless of how close the evidence was. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); see also *People v. Hassan*, 253 Ill. App. 3d 558, 566-67 (1993). Yet, the plain error rule does not operate in the nature of a general savings clause (*People v. Hayes*, 139 Ill. 2d 89, 143 (1990), *abrogated on other grounds by People v. Tisdel*, 201 Ill. 2d 210 (2002)), and the first step in such an analysis is to determine whether any error occurred at all (*People v. Hutt*, 2023 IL 128170, ¶ 29).

¶ 21                     *Suppression Motion and Warrant*

¶ 22     Turning to the merits, defendant first contends the trial court erred in denying his motion

to quash arrest and suppress evidence. When reviewing the trial court's ruling on a motion to

suppress evidence, we ordinarily apply a two-part standard of review. *People v. Eubanks*, 2019

IL 123525, ¶ 33. We give great deference to the court's factual findings and will reverse them

only if they are against the manifest weight of the evidence, while we review *de novo* the court's

legal ruling on whether evidence should be suppressed. *People v. Cregan*, 2014 IL 113600, ¶ 22.

A reviewing court may consider all trial evidence in determining whether the court's decision

denying a motion to suppress was correct. *People v. Murdock*, 2012 IL 112362, ¶¶ 35-36. To

prevail at the trial level, the defendant bears the burden of producing evidence and establishing a

*prima facie* case that the search/seizure was unreasonable before the burden then shifts to the

State. *Cregan*, 2014 IL 113600, ¶ 23; *People v. Thornton*, 2020 IL App (1st) 170753, ¶ 23. Also,

the ultimate burden always remains with the defendant. *Thornton*, 2020 IL App (1st) 170753,

¶ 23.

¶ 23     Here, defendant argues police lacked probable cause to arrest him inside his home absent

a warrant on July 14, 2020. Defendant maintains that, as a result, he was "not in lawful custody

when the buccal swab was taken at the police station," on July 31, 2020, and it should have been

excluded. He further argues that the search warrant utilized to perform the swab was fatally

defective because the warrant lacked a time, date, and judicial signature when issued.

¶ 24     Both the United States Constitution and the Illinois Constitution protect every person

from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6.

Reasonableness under the fourth amendment generally requires a warrant supported by probable

cause. *Thornton*, 2020 IL App (1st) 170753, ¶ 25. Probable cause exists where the facts and

circumstances, considered as a whole, are sufficient to justify a belief by a reasonably cautious person that the defendant has committed a crime. *People v. Hopkins*, 235 Ill. 2d 453, 472 (2009). Any search or seizure within a home without a warrant is presumptively unreasonable. *People v. Davis*, 398 Ill. App. 3d 940, 948 (2010); *Hassan*, 253 Ill. App. 3d at 567.

¶ 25    Here, defendant's argument is premised on the fact that the police actually entered his home. Defendant, however, did not present any evidence that police entered his home, nor did the trial court make any such factual finding. Instead, Officer Pettis expressly testified that the police did not enter defendant's home but arrested him outside on the front steps. Where probable cause exists, police may effectuate a warrantless arrest on a person in public without violating the fourth amendment. *Davis*, 398 Ill. App. 3d at 951; *People v. McGee*, 2015 IL App (1st) 130367, ¶ 47.

¶ 26    The question then becomes whether the police had probable cause to arrest defendant. The evidence shows they did. At the suppression hearing, Officer Pettis testified that a fellow police officer informed him of a CODIS "DNA hit," identifying defendant in A.J.'s rape case. Officer Pettis also learned that defendant had previously been arrested for gun possession, a fact defendant does not now dispute, and he was allegedly armed during the sexual assault against A.J. At trial, evidence showed that at the time of defendant's arrest, sperm from A.J.'s oral swabs had yielded a DNA profile from a male contributor. Detective Odunsi-Crawl emphasized that a "DNA association" with defendant emerged after A.J.'s rape kit was tested at the crime lab, and further, it was established that defendant lived only several blocks south of the crime scene. This associational match, combined with A.J.'s sexual assault allegations, was sufficient to sustain probable cause to support defendant's arrest under Illinois law. See *infra* ¶¶ 27-29.

¶ 27    Defendant nonetheless argues probable cause did not exist because his "DNA originally submitted to CODIS came from an uncharged case with unsubstantiated claims." Defendant refers to the case involving C.D., and he claims the DNA evidence in CODIS was a "mistake." See *supra* ¶¶ 6-7. This probable cause challenge fails for multiple reasons. One, C.D.'s case is not at issue before this court. Two, defendant failed to offer any evidence challenging C.D.'s case or the entry of his DNA into CODIS at the suppression hearing, and again, he did not argue the "unsubstantiated claims" invalidated his DNA match to A.J. in the present rape case, where her claims were in fact substantiated.

¶ 28    More significantly, this argument is a red herring. The Sexual Assault Survivors Emergency Treatment Act (410 ILCS 70/1 *et seq.* (West 2018)), which "facilitate[s] the prosecution of persons accused of sexual assault," permits the Illinois State Police to analyze and test collected evidence. *Id.* § 6.4(a). That evidence in turn may be compared to DNA information maintained by the Illinois State Police and national databases. *Id.*; see also 730 ILCS 5/5-4-3 (West 2018); 20 Ill. Adm. Code 1285.10(a) (2012) (results from DNA collection "shall be available for future criminal investigations and other forensic analysis purposes"). That is exactly what was done with respect to A.J. Moreover, section 5-4-3(*o*) of the Unified Code of Corrections (730 ILCS 5/5-4-3(*o*) (West 2018)), which addresses the Illinois State Police collection of DNA specimens, specifically states: "Mistake does not invalidate a database match. The *** arrest[ ] or conviction of a person based upon a database match or database information is not invalidated if it is determined that the specimen was obtained or placed in the database by mistake."

¶ 29    In other words, we read these provisions *in pari materia* to mean that it matters not how defendant's DNA arrived in the database. See *id.*; *People v. Rinehart*, 2012 IL 111719, ¶ 26.

Rather, what is significant is whether there was a "match" or association between the offender named in the database and the present victim. See 730 ILCS 5/5-4-3(*o*) (West 2018); see also *People v. Hickey*, 178 Ill. 2d 256, 286 (1997) (noting, a preliminary match between the defendant's DNA and the DNA from the rape victim would support probable cause to issue a search warrant for the defendant's blood sample); 20 Ill. Adm. Code 1285.10(b) (2012) ("A match between casework evidence DNA samples from a criminal investigation and DNA samples from a state or federal offender DNA database may be used only to sustain probable cause for the issuance of a warrant to obtain a separate DNA sample for confirmation.").

¶ 30　We thus find sufficient probable cause existed to support the arrest outside defendant's home in this case. However, even assuming the arrest took place inside defendant's home, we agree with the trial court that defendant's fourth amendment claim still fails. It is well established that "[e]ven an arrest made during a warrantless nonconsensual entry of a home does not vitiate a defendant's subsequent custody[,] nor does it require suppression" of subsequent evidence collected (*i.e.*, the buccal swab) "outside the home, so long as the authorities had probable cause to arrest the suspect." *People v. Segoviano*, 189 Ill. 2d 228, 244 (2000); see also *Harris*, 495 U.S. at 18 (noting an arrest inside a home absent a warrant but with probable cause does not render the continued custody of a suspect unlawful); *United States v. Crews*, 445 U.S. 463, 474 (1980) (noting an illegal arrest without more is not a bar to subsequent prosecution, nor a defense to a valid conviction).

¶ 31　Here, as set forth, police had probable cause to arrest defendant based on the DNA association between defendant and A.J. and other circumstances. Consequently, the buccal swab taken on July 31, 2020, pursuant to a warrant, was not an exploitation of any alleged illegal entry into defendant's home. See *Harris*, 495 U.S. at 19-20. That is, the buccal swab "was not the fruit

of the fact that the arrest was made in the house rather than someplace else." *Id.* at 20. Defendant thus failed to sustain his burden of producing evidence at the motion-to-suppress hearing and establishing a *prima facie* case that his arrest was illegal or that any subsequent search or seizure was unreasonable. See *Cregan*, 2014 IL 113600, ¶ 23; *Thornton*, 2020 IL App (1st) 170753, ¶ 23.

¶ 32     And, that brings us to our next point. Contrary to defendant's contention otherwise, the search warrant relied upon to retrieve defendant's DNA was not facially defective because it was marked with the time (12:44 p.m.), date (July 31, 2020), and issuing judge's handwritten signature (Judge Diana Kenworthy). See *Maryland* 569 U.S. at 446 (noting using a buccal swab on a person's inner cheek to obtain DNA is a search). Defendant points out that the impounded record contains a complaint for search warrant wherein those elements are missing; the information was left blank. This latter search warrant appears as an exhibit attached to defendant's *pro se* "Motion to Dismiss for Prosecutorial Misconduct and Malicious Prosecution," filed on November 19, 2021. The State nonetheless counters that the trial exhibits entered into evidence contain the completed complaint for search warrant.

¶ 33     As set forth, defendant did not properly raise this issue before the trial court, and his opening brief fails to even acknowledge the search warrant trial exhibit. He has therefore forfeited the matter. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020) (noting an appellant's argument must contain his contentions with citation to the authorities and pages of the record relied on; points not argued are forfeited and cannot be raised in the reply brief). Moreover, we presume the trial court's ruling was in conformity with the law and the facts, and defendant as the appellant bears the burden of overcoming that presumption. *McCann v. Dart*, 2015 IL App (1st) 141291, ¶ 15. Given that, plus the completed complaint entered into evidence at trial, we

presume police relied on this facially valid warrant in conducting defendant's buccal swab on July 31, 2020. Based on the foregoing, defendant's fourth amendment and related claims fail.

¶ 34                                    *Other Crimes Evidence*

¶ 35    Defendant next contends the court erred in admitting other-crimes evidence as to the alleged rape of C.D. He also contends the court failed to balance the probative versus prejudicial value of the evidence, as required.

¶ 36    While other-crimes evidence is generally inadmissible to show propensity (*People v. Thompson*, 2020 IL App (1st) 171265, ¶ 86), section 115-7.3 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-7.3 (West 2018)) is an exception permitting the State, in sex offense prosecutions, to introduce evidence of a defendant's other sex offenses if the evidence is otherwise admissible under evidentiary rules and has relevancy. In weighing the probative value of the evidence against any undue prejudice to the defendant, a court may consider the proximity in time to the charged offense, the degree of factual similarity between the two offenses, and any other relevant facts or circumstances. *Id.* § 115-7.3(c). While a court must meaningfully assess these factors, a court need not conduct this balancing test on the record before making its determination. *People v. Petrakis*, 2019 IL App (3d) 160399, ¶ 22. We review a trial court's ruling on the admissibility of evidence for an abuse of discretion. *Thompson*, 2020 IL App (1st) 171265, ¶ 84; *People v. Kraybill*, 2014 IL App (1st) 120232, ¶ 41.

¶ 37    Defendant now claims trial error, emphasizing that he was never arrested or charged with a crime against C.D., and although she reported a rape, he proposes the interaction could have been entirely consensual. Defendant relies on cases like *People v. Miller*, 55 Ill. App. 3d 421, 426 (1977), noting that evidence of other crimes cannot be admitted until it is shown another crime actually took place. For its part, the State acknowledges that although it sought and

secured the right to introduce section 115-7.3 evidence involving C.D., it ultimately did not pursue this proffer at trial. The State thus maintains that defendants' contentions are moot because the State did not in fact introduce other-crimes evidence to prove defendant's propensity to commit sex crimes in its case-in-chief. See *In re Shelby R.*, 2013 IL 114994, ¶ 15 (noting a matter is moot if no controversy exists or if events have occurred that foreclose the reviewing court from granting effectual relief to the complaining party). For the reasons to follow, we agree with the State.

¶ 38    Here, Detective Odunsi-Crawl testified on direct examination that defendant "Dennis Cummings" became the "*named offender*" in A.J.'s case when "[t]here was a DNA association with another case[,] with him being the *named offender* in that case." (Emphases added.) The State then asked, "And did that DNA association come up once [A.J.'s] criminal sexual assault kit had been tested at the crime lab?" Detective Odunsi-Crawl responded, yes. Detective Odunsi-Crawl testified that defendant was then arrested and his buccal swab taken on July 31, 2020.

¶ 39    In its case-in-chief, the State did not present evidence that defendant had committed a crime, let alone that it was sexual in nature. C.D. did not testify, nor did any hospital worker, police officer, or DNA scientist, as to the alleged offense. Moreover, Detective Odunsi-Crawl did not mention the nature of the prior offense, name a prior victim, or explain that defendant's original DNA had been logged into CODIS or any other law enforcement related database. Similarly, there was no suggestion that defendant's DNA was part of a database of convicted felons. We therefore reject defendant's contention that the term "named offender" specifically implied he committed or was convicted of a sexual assault against C.D. The testimony was ambiguous, as Detective Odunsi-Crawl failed to even cite a police agency source of defendant's DNA. The State's opening similarly reflected vague references to "a database" and no mention

of C.D.[5] Simply put, the State never introduced evidence of the uncharged rape of C.D. to establish defendant's propensity for rape in A.J.'s case. See 725 ILCS 5/115-7.3 (West 2018).

¶ 40    Moreover, this testimony was relevant, limited, and not unduly prejudicial. Indeed, the consequential steps in a criminal investigation are admissible and relevant when necessary and important to fully explain the State's case to the jury, notwithstanding that these steps reference other-crimes evidence. *People v. Jackson*, 232 Ill. 2d 246, 267 (2009); *People v. Cerda*, 2021 IL App (1st) 171433, ¶ 111 (noting such testimony is allowed even though the jury may infer prejudicial prior criminal activity). Viewing Detective Odunsi-Crawl's testimony in context, we note the trial evidence showed there was a time gap of about a year-and-a-half between A.J.'s 2019 rape and defendant's 2020 arrest. Seventeen days passed between when defendant was arrested on July 14, 2020, and his buccal swab was taken on July 31, 2020. During opening statements, defendant highlighted this time gap, asserting there could not have been a DNA match to the victim at his arrest because his buccal swab was not performed until days later. Defendant emphasized that he had never been convicted of a crime or given away his DNA, so it was unfathomable how his DNA was in "some database." In addition, the jury heard from A.J. that she could not describe defendant's face to police or identify him from the photo array; she did not know defendant at that time.

¶ 41    Thus, Detective Odunsi-Crawl's testimony, that there was a "DNA association with another case," and defendant was "the *named offender* in that case," was necessary and important

---

[5]Defendant complains that the State referenced C.D.'s rape case in opening statements when the prosecutor said, "Again, it came back to Dennis Cummings." The record belies this claim. It shows the State first noted that A.J.'s rape kit and oral swabs yielded a "a male DNA profile" and "sperm fraction," which was "searched in a database and it came back to Dennis Cummings." The State continued, noting that following defendant's arrest and buccal swab, "the male DNA profile found in [A.J.'s] mouth was associated with this defendant. Again, it came back to Dennis Cummings." This latter sentence directly referenced A.J.'s case.

to explain how defendant's DNA first entered the database and how he was identified before police arrested him and conducted a full buccal swab confirming his DNA inside A.J.'s mouth. See *Jackson*, 232 Ill. 2d at 273-74. Additionally, Detective Odunsi-Crawl's testimony was limited to the fact that defendant's DNA bore an association to A.J.'s rape kit, which had been lab tested. See *id.* at 274; see also *People v. Nieves*, 193 Ill. 2d 513, 530 (2000) (noting other-crimes evidence presented as steps in a criminal investigation must also specifically connect the defendant with the crimes for which he is being tried); *People v. Maldonado*, 402 Ill. App. 3d 411, 426-27 (2010) (same). This was permissible investigatory process testimony, not offered to establish defendant's propensity to commit crime. See *Cerda*, 2021 IL App (1st) 171433, ¶ 111. As such, it was not other-crimes evidence that would unduly persuade the jury of defendant's guilt. See *id.* It could also be considered part of the narrative involving the charged crime. See *People v. Pikes*, 2013 IL 115171, ¶ 20 (noting other crimes evidence may be admitted when "part of the 'continuing narrative' of the charged crime" (quoting *People v. Adkins*, 239 Ill. 2d 1, 33 (2010))). We find no abuse of discretion in the admission of this evidence, nor any error. See *Thompson*, 2020 IL App (1st) 171265, ¶ 84. As stated, defendant did not contemporaneously object or seek a limiting instruction.

¶ 42     Rather, we agree with the State that to the extent any other-crimes evidence was introduced and emphasized, it resulted from defendant's own cross-examination of Detective Odunsi-Crawl:

> "Q. I just want to ask that how is it that District 5 had me as a named offender—a sex offender, I assume, when I have never been charged as a sex offender or have never been questioned about me being a sex offender or I have never given my DNA to anyone ever, the police to be exact?

A. I would love to answer your question. I really don't quite understand your question.

Q. I'll reask it. I was just asking how is it that District 5 has me, Dennis Cummings—in the police report it says named offender, Dennis Cummings. How am I a listed offender at the 5th District when I have never been accused or charged with any sexual case ever and I have never, ever given my DNA ever?

A. Okay. So your DNA was—you were an associate to another case, another case that your DNA was identified in.

Q. What exactly is this case? I have no knowledge of this case still to this day.

A. There was another criminal sexual assault case that you were a named offender in."

¶ 43     In response to this, on redirect examination, the State asked Detective Odunsi-Crawl whether she was aware of another sexual assault investigation from 2018 with a victim named C.D. The detective responded, yes, and further noted pursuant to the State's questioning that there was a rape kit submitted to the crime lab for DNA testing in C.D.'s case. The testing revealed "a male profile found on the neck swabs of that rape victim," and defendant was a "named offender" in that criminal sexual assault case. Detective Odunsi-Crawl thus testified that the DNA profiles from C.D.'s case were already in the database. Pursuant to the State's questioning, Detective Odunsi-Crawl explained that there was a "hit" with C.D.'s case when A.J.'s DNA profiles were also placed in the database.

¶ 44     Where, as here, the defense opens the door to a particular subject on cross, the State may on redirect question the witness to clarify or explain matters brought out on cross. *People v. Thompkins*, 121 Ill. 2d 401, 444 (1988). Defendant's strategy was to expose details of C.D.'s

18

case. Although he did not testify or present any evidence, defendant conveyed to the jury through his cross of Detective Odunsi-Crawl that he had never before been charged with a sexual assault or given police his DNA, and he invited her to explain "What exactly is this case?" Thus, what would have otherwise been ambiguous testimony about a DNA "association" morphed into a more detailed discussion of C.D.'s alleged sexual assault and how defendant's DNA entered the database. Defendant's own cross informed the jury that he had been accused of committing a crime that was sexual in nature. He himself offered this propensity evidence. Where defendant invited the error of which he now complains, his claim has no merit. See *People v. Tompkins*, 2023 IL 127805, ¶ 54 (noting a party cannot advance a theory or argument on appeal that is inconsistent with the position taken below).

¶ 45    Similarly, plain-error review is forfeited when the defendant invites the error. *People v. Harding*, 2012 IL App (2d) 101011, ¶ 17; see also *People v. Patrick*, 233 Ill. 2d 62, 77 (2009) (declining to address plain error where the defendant procured the error); *People v. Bates*, 2018 IL App (4th) 160255, ¶ 74 (noting plain error does not apply to affirmative acquiescence). We also conclude that even assuming any error in admitting "named offender" or "DNA association with another case," this did not rise to the level of first-prong plain error because the evidence was not closely balanced. Rather, there was substantial, if not overwhelming, evidence that A.J. was raped by defendant. A.J. immediately outcried and conveyed the details of her rape consistently to her boyfriend, the hospital nurse, and at trial. The circumstantial evidence showing footprints in the snow by the train and the proximity of defendant's home to the location of the offense further supported A.J.'s claim. Significantly, A.J.'s testimonial evidence that she was raped orally, and the then unknown offender ejaculated in her mouth, when combined with the scientific evidence establishing that defendant's DNA could not be excluded from A.J.'s oral

swab, unquestionably showed defendant was the perpetrator of this aggravated criminal sexual assault.

¶ 46    Likewise, assuming this category of claim could even qualify as second-prong plain error, the claim still fails. See *People v. Clark*, 2016 IL 118845, ¶¶ 42, 46-47. We are not persuaded that the State's limited reference to "named offender" or "DNA association with another case," deprived defendant of a fair trial or constituted prejudice under second-prong plain error. See *People v. Garcia*, 2017 IL App (1st) 133398, ¶ 75; see also *Hayes*, 139 Ill. 2d at 146 (noting, a detective's testimony that a witness identified defendant's photo from a book at the "Area 1 Violent Crimes" did not deprive the defendant of a fair trial). The State's closing and rebuttal, contrary to defendant's contentions, focused almost exclusively on A.J.'s case, with only passing references to the associated case (although not C.D. specifically) and the evidence that defendant invited during his cross of Detective Odunsi-Crawl. Given this record, including the trial focus on A.J. and DNA evidence showing defendant was the perpetrator of the sexual assault against her, there was no danger that the jury convicted defendant based on the alleged, uncharged other crime involving C.D. See *Garcia*, 2017 IL App (1st) 133398, ¶ 75; *People v. Rios*, 2022 IL App (1st) 171509, ¶ 64 (noting that the erroneous admission of other-crimes evidence requires reversal only it was a material factor in the defendant's conviction such that, without the evidence, the verdict likely would have been different); see also *Jackson*, 232 Ill. 2d at 265 (noting evidentiary rulings will not warrant reversal unless the record shows substantial prejudice affecting the trial outcome). That is, even absent the allegedly erroneous evidence, the jury still would have found defendant guilty. See *id*. Defendant has not fulfilled his burden of persuasion as to plain error. See *Bates*, 2018 IL App 4th 160255, ¶ 74. For these reasons, defendant's other-crimes contentions fail.

¶ 47 Defendant also contends the trial court failed to conduct an adequate balancing test to determine whether other-crimes evidence should be admitted. Given our above-stated determination, we agree with the State that defendant's claim is moot. See *Shelby R.*, 2013 IL 114994, ¶ 15. Again, the State did not offer other-crimes evidence for propensity to commit sex crimes in its case-in-chief. Nevertheless, although a trial court need not make an on-the-record finding as to other-crimes evidence, the court expressly did so here:

> "The court is well familiar with Section 115-7.3 of the code of criminal procedure. The court is well familiar with the case such as People versus Donoho, D-o-n-o-h-o, a case from the Illinois Supreme Court in this area in our jurisdiction. The court is also familiar with such case as People versus Taylor. *** In viewing the court's [State's] proffer, the court determines the appropriate value outweighs any prejudice or effect, that motion will be allowed."

While the court clearly misspoke in stating "appropriate value," rather than "probative," it cited the proper legal authority before concluding that other-crimes evidence was permitted here.[6] See *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43 (noting we generally presume that a trial court knows and follows the law). This was proper. See *Petrakis*, 2019 IL App (3d) 160399, ¶ 22.

¶ 48                                  *Judicial Bias*

¶ 49 Last, defendant contends the trial court was biased against him and at various points assumed the role of prosecutor. We disagree.

---

[6]Defendant writes that there "is no indication the court relied on the State's motion." However, the record shows the court asked whether the State wished to stand on its written motion and also referenced the motion in its ultimate finding. Defendant's claim is therefore rebutted by the record.

¶ 50    A trial judge is presumed to be impartial, and the burden of overcoming this presumption rests on the party asserting prejudice. *Eychaner v. Gross*, 202 Ill. 2d 228, 280 (2002). That party must present evidence of prejudicial trial conduct and evidence of the judge's personal bias, which can stem from an extrajudicial source and also the facts/events at trial. *Id.* Yet, judicial rulings alone almost never constitute a valid basis for a claim of judicial bias or partiality. *Liteky v. United States*, 510 U.S. 540, 555 (1994). Also, ordinarily, a judge's opinions based on trial facts and events during the proceedings, as well as any critical, disapproving, or hostile remarks, do not support a bias or partiality challenge. *Id.*; *Eychaner*, 202 Ill. 2d at 281. Only if these matters "display a deep-seated favoritism or antagonism that would make fair judgment impossible," can such a challenge be sustained. *Liteky*, 510 U.S. at 555. Disqualifying a judge for judicial bias is limited to "the most extreme circumstances." *People v. Conway*, 2023 IL 127670, ¶ 22.

¶ 51    In support of his bias claim, for example, defendant points to the trial court's interjection during the questioning of Officer Pettis by defendant's then private counsel for the suppression motion. Defendant points to other instances at trial, such as during defendant's opening statement, his cross of A.J., and his cross of Detective Odunsi-Crawl, wherein the court sustained an objection even though no objection was pending by the State. Defendant maintains this caused prejudice insofar as "it influenced the jurors to view the court as an advocate" for the State, rather than a neutral arbiter.

¶ 52    We have reviewed the record in full, including these various instances of alleged judicial bias and prosecutorial conduct, and find defendant has failed to sustain his burden of establishing bias. As to the suppression hearing, the defense asked Officer Pettis if he had a warrant for defendant's arrest and to search his home, to which Officer Pettis said no. Defense counsel then

queried, "Who makes the determination whether or not it's probable cause for you to go to someone's home?" and the trial court interjected, "I'm going to sustain that because I'll make that determination." Defendant's claim of error fails for several reasons. First, defense counsel (and defendant when he later appended this testimony to his suppression motion) acquiesced to the court's ruling by stating, "I understand." See *People v. Lawrence*, 2018 IL App (1st) 161267, ¶ 54 (noting a defendant cannot complain of an error to which he affirmatively acquiesces). Second, it is well established that whether probable cause exists is a legal determination garnering *de novo* review. See *Cregan*, 2014 IL 113600, ¶ 22. It is not a matter for a witness to determine, so the court's curtailment of the testimony was perfectly appropriate. Third, regardless, erroneous rulings cannot serve as a basis for bias. See *Liteky*, 510 U.S. at 555.

¶ 53    As to defendant's opening statement, the court only interjected when defendant began to inform the jury that the search warrant for his DNA was invalid. The court noted this pretrial matter was already resolved and inappropriate for opening statements. Defendant also began to inform the jury about his bond hearing, and the court similarly asked defendant to "[m]ove on," since such pretrial matters were no longer at issue. As to A.J.'s cross, defendant said, "I just would like to know were you accusing me of this crime specifically?" to which the court stated, "Sustained. Sustained. She has not accused you of this crime. She has not identified you." As to Detective Odunsi-Crawl's cross and in response to her statement that defendant was a named offender in another sexual assault case, defendant said, "I was never questioned about this case, never questioned about the—," before the court interjected, "Sustained. Sustained. Mr Cummings." The court asked defendant to present a question and said, "If you want to testify to these facts later, you can, but we're not in your case. It's not the time for you to testify. It's time for you to ask questions."

¶ 54 Rather than exhibiting any bias, this evidence reflects the court's inherent authority to control its own courtroom, docket, and manage defendant's *pro se* inefficiencies and nonmeritorious litigation. See *People v. Bramlett*, 347 Ill. App. 3d 468, 472 (2004); see also *People v. Faria*, 402 Ill. App. 3d 475, 479 (2010) (noting a trial court has a responsibility to achieve prompt and convenient dispatch of court proceedings). While the court perhaps misspoke in stating "sustained," at various points, defendant does not challenge the court's actual rulings in the examples cited above. Curtailing defendant's discussion during opening statements of the already-decided suppression motion and asking defendant not to testify during his cross of a witness all are reasonable requests by the court and intended to advance the proceedings. See *Faria*, 402 Ill. App. 3d at 482.

¶ 55 Further, as the State notes, the court's comments cannot be viewed in isolation; allegations of judicial bias or prejudice must be viewed in context. See *id.* Notably, defendant was disrespectful, hostile, and obstreperous throughout the two years of official court proceedings, even as the court corrected defendant's many misunderstandings of the law and criminal procedure. Defendant repeatedly accused the judge of being corrupt, a criminal, and conspiring with the State to manufacture or cover up evidence. For example, prior to jury selection and before the venire, defendant announced he was illegally being forced to trial and stated, "Objection. For the record the judge is a criminal." After repeatedly interrupting Judge Joyce while he spoke to the jury, defendant again stated, "You a criminal. I'm telling them all. You a criminal. He a criminal." Defendant was held in criminal contempt of court for this disruptive behavior and removed from the room at that time. During the jury questioning and selection, he then continuously banged on the doors of lock-up, "making a racket." In spite of

defendant's assertions, his two pretrial motions to substitute Judge Joyce for cause due to bias and prejudice were handily rejected after extensive hearings.

¶ 56    The court's cited comments thus reflected an unwillingness to be manipulated by defendant and the grave task the court had before it. The record shows the court instead exhibited extreme patience and balance towards an unruly litigant. For all these reasons, defendant has failed to establish any bias or prejudice.

¶ 57                                    CONCLUSION

¶ 58    For the reasons stated, we find no error and therefore need not engage any further in the plain error analysis. See *People v. Williams*, 2022 IL App (2d) 200455, ¶ 104. We affirm the judgment of the circuit court.

¶ 59    Affirmed.

*People v. Cummings*, 2023 IL App (1st) 220520

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-CR-8485; the Hon. Timothy J. Joyce, Judge, presiding. |
| **Attorneys for Appellant:** | Douglas H. Johnson, of Kathleen T. Zellner & Associates, P.C., of Warrenville, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Erin K. Slattery, and David H. Iskowich, Assistant State's Attorneys, of counsel), for the People. |